IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

TAVARES CARSON,
     Petitioner,

vs.                             Case No.:  3:13cv623/MCR/EMT

MICHAEL CREWS,
     Respondent.
_____/

## REPORT AND RECOMMENDATION

This cause is before the court on Petitioner's second amended petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 (doc. 19). Respondent filed an answer and relevant portions of the state court record (doc. 22). Petitioner filed a reply (doc. 26).

The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters. *See* N.D. Fla. Loc. R. 72.2(B); *see also* 28 U.S.C. § 636(b)(1)(B), (C) and Fed. R. Civ. P. 72(b). After careful consideration of all issues raised by Petitioner, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rules Governing Section 2254 Cases 8(a). It is further the opinion of the undersigned that the pleadings and attachments before the court show that Petitioner is not entitled to relief.

I.     BACKGROUND AND PROCEDURAL HISTORY

The relevant aspects of the procedural background of this case are established by the state court record (*see* doc. 22).[1] Petitioner was indicted in the Circuit Court in and for Escambia County, Florida, Case No. 96-CF-3375, with one count of first degree premeditated or felony murder with a weapon (Count One) and one count of armed robbery with a firearm (Count Two) (Ex. A at 1–4).

_____

[1] Hereinafter all citations to the state court record refer to the exhibits submitted with Respondent's answer (doc. 22). If a cited page has more than one page number, the court cites to the "Bates stamp" page number.

A jury found him guilty of first degree felony murder with a weapon and armed robbery with a firearm (Ex. A at 59–60, Ex. B).  The court adjudicated Petitioner guilty and sentenced him as an habitual felony offender to concurrent life sentences, with pre-sentence jail credit of one year and 119 days (Ex. A at 191–96).  Petitioner appealed the judgment to the Florida First District Court of Appeal ("First DCA"), Case No. 98-1648 (Ex. D).  On August 3, 1999, the First DCA affirmed the convictions and the sentence on the murder count, but reversed the habitual felony offender sentence on the robbery count and remanded for resentencing on the robbery count (Ex. G).  Carson v. State, 739 So. 2d 653 (Fla. 1st DCA 1999).  On October 11, 1999, the trial court modified Petitioner's sentence on the robbery count to life imprisonment without the habitual felony offender enhancement (Ex. H).

On March 17, 2000, Petitioner filed a counseled motion for post-conviction relief, pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure (Ex. I at 1–11).  The state circuit court summarily denied the motion in an order rendered April 20, 2000 (id. at 49–51).  Petitioner appealed the decision to the First DCA, Case No. 1D00-1915 (Ex. J).  The First DCA affirmed the decision per curiam without written opinion on September 20, 2000, with the mandate issuing October 17, 2000 (Ex. K).  Carson v. State, 770 So. 2d 681 (Fla. 1st DCA 2000) (Table).

On April 13, 2001, Petitioner filed a counseled federal habeas petition under 28 U.S.C. § 2254, Case No. 3:01cv147/LAC/MD (Ex. L).  This court denied the petition on February 26, 2002 (Ex. M).  Petitioner filed a motion for certificate of appealability in the Eleventh Circuit Court of Appeals, Case No. 02-11807.  The Eleventh Circuit denied the motion on June 19, 2002, and denied Petitioner's motion for reconsideration on August 12, 2002.  Petitioner filed a petition for writ of certiorari in the Supreme Court of the United States, Case No. 02-7842, but the Court denied the petition.  Carson v. Crosby, 537 U.S. 1199, 123 S. Ct. 1268, 154 L. Ed. 2d 1038 (2003) (Mem).

On May 2, 2007, Petitioner filed another counseled Rule 3.850 motion in state court alleging newly discovered evidence (Ex. O at 1–20).  The state circuit court summarily denied the motion in an order rendered December 14, 2007 (id. at 21–26).  Petitioner appealed the decision to the First DCA, Case No. 1D08-303 (Ex. P).  The First DCA affirmed the decision per curiam without written opinion on July 18, 2008, with the mandate issuing August 13, 2008 (Ex. Q).  Carson v. State, 968 So. 2d 605 (Fla. 1st DCA 2008) (Table).

On May 22, 2010, Petitioner filed a pro se third Rule 3.850 motion in state court again alleging newly discovered evidence (Ex. R at 1–10).  The state circuit court summarily denied the motion in an order rendered August 5, 2010 (*id.* at 29–32).  Petitioner appealed the decision to the First DCA, Case No. 1D10-5152 (Ex. S).  The First DCA affirmed the decision per curiam without written opinion on December 30, 2010, with the mandate issuing March 1, 2011 (Ex. S).  Carson v. State, 53 So. 3d 1024 (Fla. 1st DCA 2010) (Table).

On July 20, 2011, Petitioner filed a pro se motion to correct illegal sentence, pursuant to Rule 3.800(a) of the Florida Rules of Criminal Procedure (Ex. T at 1–7).  The state circuit court granted the motion only to the extent that Petitioner was entitled to resentencing on the robbery conviction (*id.* at 26–28).  Petitioner was appointed counsel and resentenced on February 23, 2012, to a term of 61.5 months in prison, to run concurrently with the sentence on the murder count and with credit of 484 days of pre-sentence jail credit plus all time previously served in the Florida Department of Corrections (*id.* at 37–67, 85–90).  Petitioner appealed the decision to the First DCA, Case No. 1D12-1139 (Ex. T at 92, Exs. U, V).  While the appeal was pending, Petitioner filed a pro se motion to correct sentencing error, pursuant to Rule 3.800(b) of the Florida Rules of Criminal Procedure (Ex. T at 98–104).  The state circuit court struck the motion as unauthorized, because Petitioner was represented by counsel (*id.* at 105–06).  Petitioner filed an amended pro se Rule 3.800(b) motion (*id.* at 108–14).  The state circuit court summarily denied the motion (*id.* at 118–19).  The First DCA affirmed the new sentence per curiam without written opinion on April 23, 2013, with the mandate issuing September 11, 2013 (Ex. W).  Carson v. State, 113 So. 3d 838 (Fla. 1st DCA 2013) (Table).

Petitioner filed the instant federal habeas action on December 9, 2013 (doc. 1).

## II.   STANDARD OF REVIEW

Section 2254(a) of Title 28 provides that "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court" upon a showing that his custody is in violation of the Constitution or laws of the United States.  As the instant petition was filed after April 24, 1996, it is subject to the more deferential standard for habeas review of state court decisions under § 2254 as brought about by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA).  Pub.L. 104-132, § 104, 110 Stat. 1214, 1218–19.  In relevant part, section 2254(d) now provides:

> (d)   An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> > (1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254 (2002).

The United States Supreme Court explained the framework for § 2254 review in Williams v. Taylor, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).[2]  The appropriate test was described by Justice O'Connor as follows:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court.  Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied—the state court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States."  Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

Id., 529 U.S. at 412–13 (O'Connor, J., concurring); Ramdass v. Angelone, 530 U.S. 156, 120 S. Ct. 2113, 2119–20, 147 L. Ed. 2d 125 (2000).  In employing this test, the Supreme Court has instructed that on any issue raised in a federal habeas petition upon which there has been an adjudication on

---

[2] Unless otherwise noted, references to Williams are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367–75, 390–99); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and—except as to the footnote—Scalia) in part II (529 U.S. at 403–13).  The opinion of Justice Stevens in Part II was joined by Justices Souter, Ginsburg, and Breyer.

the merits in a formal State court proceeding, the federal court should first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision." Lockyer v. Andrade, 538 U.S. 63, 71–72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003).  The law is "clearly established" if Supreme Court precedent at the time "would have compelled a particular result in the case." Neelley v. Nagle, 138 F.3d 917, 923 (11th Cir. 1998), *overruled on other grounds by* Parker v. Head, 244 F.3d 813, 835 (11th Cir. 2001).

Next, the court must determine whether the State court adjudication is contrary to the clearly established Supreme Court case law, either because "'the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases' or because 'the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] [Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.'" Lockyer, 538 U.S. at 73 (quoting Williams, 529 U.S. at 405–06).  The Supreme Court has clarified that "[a]voiding these pitfalls does not require citation to our cases—indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 365, 154 L. Ed. 2d 263 (2002) (quoting Williams, 529 U.S. at 405–06).  If the State court decision is found in either respect to be contrary, the district court must independently consider the merits of the petitioner's claim.  Moreover, where there is no Supreme Court precedent on point, the state court's conclusion cannot be contrary to clearly established federal law. *See* Henderson v. Campbell, 353 F.3d 880, 890 n. 15 (11th Cir. 2003).

If on the other hand, the State court applied the correct Supreme Court precedent and the facts of the Supreme Court cases and the petitioner's case are not materially indistinguishable, the court must go to the third step and determine whether the State court "unreasonably applied" the governing legal principles set forth in the Supreme Court's cases.  The standard for an unreasonable application inquiry is "whether the state court's application of clearly established federal law was objectively unreasonable." Williams, 529 U.S. at 409.  Whether a State court's decision was an unreasonable application of a legal principle must be assessed in light of the record the court had before it.  Holland v. Jackson, 542 U.S. 649, 652, 124 S. Ct. 2736, 2737–38, 159 L. Ed. 2d 683 (2004) (per curiam); *cf.* Bell v. Cone, 535 U.S. 685, 697 n.4, 122 S. Ct. 1843, 1851 n.4, 152 L. Ed.

2d 914 (2002) (declining to consider evidence not presented to state court in determining whether its decision was contrary to federal law).  An objectively unreasonable application of federal law occurs when the State court "identifies the correct legal rule from Supreme Court case law but unreasonably applies that rule to the facts of the petitioner's case" or "unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context." Putman v. Head, 268 F.3d 1223, 1241 (11th Cir. 2001).  "In determining whether a state court's decision represents an unreasonable application of clearly established federal law, a federal court conducting habeas review 'may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable.'" Gill v. Mecusker, 633 F.3d 1272, 1287 (11th Cir. 2011) (quoting Williams, 529 U.S. at 411).  The AEDPA's "unreasonable application" standard focuses on the state court's ultimate conclusion, not the reasoning that led to it.  *See* Gill, *supra* at 1291–92.  Under § 2254(d), a habeas court must determine what arguments or theories supported or could have supported the state court's decision, and then ask whether it is possible that fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of the Supreme Court.  *See* Harrington v. Richter, 562 U.S. 86, 131 S. Ct. 770, 786, 178 L. Ed. 2d 624 (2011); *see also* Gill, *supra,* at 1292 (the federal district court may rely on grounds other than those articulated by the state court in determining that habeas relief was not warranted, so long as the district court did not err in concluding that the state court's rejection of the petitioner's claims was neither an unreasonable application of a Supreme Court holding nor an unreasonable determination of the facts).

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in State court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  The Supreme Court has clarified that: "a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." Miller-El v. Cockrell, 537 U.S. 322, 340, 123 S. Ct. 1029, 1041, 154 L. Ed. 2d 931 (2003) (dictum).

When performing its review under § 2254(d), the federal court must bear in mind that any "determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); *see, e.g.,* Miller-El, 537 U.S. at 340 (explaining that a federal court can disagree with a state court's factual finding and, when guided by AEDPA, "conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence"); Jones v. Walker, 469 F.3d 1216, 1226–27 (11th Cir. 2007) (holding that § 2254(d)(2)'s "unreasonable determination" standard "must be met by clear and convincing evidence," and concluding that that standard was satisfied where prisoner showed "clearly and convincingly" that the state court's decision "contain[ed] an 'unreasonable determination' of fact.").  The "unreasonable determination of the facts" standard is only implicated to the extent that the validity of the state court's ultimate conclusion is premised on unreasonable fact finding.  *See* Gill, 633 F.3d at 1292.  A petitioner is not entitled to relief unless he demonstrates by clear and convincing evidence that the record reflects an insufficient factual basis for affirming the state court's decision. *Id.*

Only if the federal habeas court finds that the petitioner satisfied AEDPA, and § 2254(d), does the court take the final step of conducting an independent review of the merits of the petitioner's claims.  *See* Panetti v. Quarterman, 531 U.S. 930, 953, 127 S. Ct. 2842, 2858, 168 L. Ed. 2d 662 (2007); Jones, 469 F.3d 1216 (same).  The writ will not issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States."  28 U.S.C. § 2254(a).

III.    EXHAUSTION AND PROCEDURAL DEFAULT

It is a long-standing prerequisite to the filing of a federal habeas corpus petition that the petitioner have exhausted available state court remedies, *see* 28 U.S.C. § 2254(b)(1), thereby giving the State the "'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights."  Duncan v. Henry, 513 U.S. 364, 365, 115 S. Ct. 887, 888, 130 L. Ed. 2d 865 (1995) (quoting Picard v. Connor, 404 U.S. 270, 275, 92 S. Ct. 509, 30 L. Ed. 2d 438 (1971) (citation omitted)).  To satisfy the exhaustion requirement, the petitioner must "fairly present" his claim in each appropriate state court, alerting that court to the federal nature of the claim.  Duncan, 513 U.S.

at 365–66; O'Sullivan v. Boerckel, 526 U.S. 838, 845, 119 S. Ct. 1728, 144 L. Ed. 2d 1 (1999); Picard, 404 U.S. at 277–78.

The Supreme Court has provided lower court with guidance for determining whether a habeas petitioner has met the "fair presentation" requirement.  In Picard v. Connor, the Court held that, for purposes of exhausting state remedies, a claim for relief in habeas corpus must include reference to a specific federal constitutional guarantee, as well as a statement of the facts which entitle the petitioner to relief.  404 U.S. at 277.  In announcing that "the substance of a federal habeas corpus claim must first be presented to the state courts," id., 404 U.S. at 278, the Court rejected the contention in that case that the petitioner satisfied the exhaustion requirement by presenting the state courts only with the facts necessary to state a claim for relief.

Additionally, the Court has indicated that it is not enough that a petitioner make a general appeal to a constitutional guarantee as broad as due process to present the "substance" of such a claim to a state court.  Anderson v. Harless, 459 U.S. 4, 103 S. Ct. 276, 74 L. Ed. 2d 3 (1982).  In Anderson, the habeas petitioner was granted relief by the Sixth Circuit Court of Appeals on the ground that a jury instruction violated due process because it obviated the requirement that the prosecutor prove all the elements of the crime beyond a reasonable doubt.  459 U.S. at 7 (citing Sandstrom v. Montana, 442 U.S. 510, 99 S. Ct. 2450, 61 L. Ed. 2d 39 (1979)).  The only manner in which the habeas petitioner cited federal authority was by referring to a state court decision in which "the defendant . . . asserted a broad federal due process right to jury instructions that properly explain state law."  Anderson, 459 U.S. at 7 (internal quotation marks omitted).  The Court expressed doubt that a defendant's citation to a state-court decision predicated solely on state law was sufficient to fairly apprise a reviewing court of a potential federal claim merely because the defendant in the cited case advanced a federal claim.  Id., 459 U.S. at 7 & n.3.  Furthermore, the Court clarified that such a citation was obviously insufficient when the record satisfied the federal habeas court that the federal claim asserted in the cited case was not the same as the federal claim on which federal habeas relief was sought.  Id.

Years later, the Supreme Court readdressed the "fair presentation" requirement in Duncan v. Henry, 513 U.S. 364.  The Duncan Court strictly construed the exhaustion requirement so as to mandate that, if state and federal constitutional law overlap in their applicability to a petitioner's

claim, the petitioner must raise his issue in terms of the applicable federal right in state court in order to obtain federal review of the issue.[3]  The Supreme Court explained, "[i]f a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal, but in state court."  Duncan, 513 U.S. at 365–66.  More recently, the Supreme Court again focused upon the requirement of "fair presentation," holding that "ordinarily a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so."  Baldwin v. Reese, 541 U.S. 27, 124 S. Ct. 1347, 1351, 158 L. Ed. 2d 64 (2004).  In Baldwin, the Supreme Court recognized that "[a] litigant wishing to raise a federal issue can easily indicate the federal law basis for his claim in a state-court petition or brief, for example, by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim 'federal.'"  Id., 541 U.S. at 32.  This language, while not part of the Court's holding, provides helpful instruction.  With regard to this language, the Eleventh Circuit explained in McNair v. Campbell, 416 F.3d 1291 (11th Cir. 2005):

> If read in a vacuum, this dicta might be thought to create a low floor indeed for petitioners seeking to establish exhaustion.  However, we agree with the district court that this language must be "applied with common sense and in light of the purpose underlying the exhaustion requirement[:] 'to afford the state courts a meaningful opportunity to consider allegations of legal error without interference from the federal judiciary.'"  McNair [v. Campbell], 315 F. Supp. 2d at 1184 (quoting Vasquez v. Hillery, 474 U.S. 254, 257, 106 S. Ct. 617, 620, 88 L. Ed. 2d 598 (1986)).  This is consistent with settled law established by the Supreme Court. . . . We therefore hold that "'[t]he exhaustion doctrine requires a habeas applicant to do more than scatter some makeshift needles in the haystack of the state court record.'"

416 F.3d at 1302-03 (citations omitted).[4]

---

[3] The petitioner in Duncan raised a federal due process claim in his habeas petition, but had raised only a state constitutional claim in his state appeal.  Presented with a state constitutional claim, the state court applied state law in resolving the appeal.  513 U.S. at 366.

[4] In his initial brief before the Court of Criminal Appeals, McNair cited one federal case in a string citation containing other state cases, and in a closing paragraph in his argument that extraneous materials were considered by the jury during deliberations, stated that there was a violation of his rights "protected by the Fifth, Sixth, Eighth[,] and Fourteenth Amendments to the United States Constitution, the Alabama Constitution[,] and Alabama law."  McNair v. Campbell, 416 F.3d 1291, 1303 (11th Cir. 2005).  The court found that these references to federal law were not sufficient

The Eleventh Circuit, prior to <u>Duncan</u>, had broadly interpreted the "fair presentation" requirement.  After <u>Duncan</u>, however, the Eleventh Circuit has taken a more narrow approach.  For example, in <u>Zeigler v. Crosby</u>, the court held that the habeas petitioner failed to "fairly present" his juror misconduct claims to the state courts where his brief to the state appellate court did not refer to the federal constitutional issues raised in his federal habeas petition, and none of the cases cited in his direct appeal discussed the United States Constitution.  345 F.3d 1300, 1307 (11th Cir. 2003).  The Eleventh Circuit specifically noted that the section of the petitioner's appellate brief which dealt with juror misconduct contained the words:  "Appellant was denied due process and a fair trial. . . .," which could be interpreted as asserting a fair trial claim under the Due Process Clause of the Florida Constitution.  *Id.* at 1308 n.5.  The only cases cited in the discussion of the issue in petitioner's state appellate brief were state supreme court cases that made no mention of the United States Constitution and cited no federal cases.  The court concluded that petitioner's "[c]ursory and conclusional sentence (unaccompanied by citations to federal law), . . . did not present to the Florida courts the federal claim asserted to us."  *Id.*

An issue that was not properly presented to the state court and which can no longer be litigated under state procedural rules is considered procedurally defaulted, that is, procedurally barred from federal review.  *See* <u>O'Sullivan</u>, 526 U.S. at 839–40, 848; <u>Bailey v. Nagle</u>, 172 F.3d 1299, 1302–03 (11th Cir. 1999).  This court will also consider a claim procedurally defaulted if it was presented in state court and rejected on the independent and adequate state ground of procedural bar or default.  *See* <u>Coleman v. Thompson</u>, 501 U.S. 722, 734–35 & n.1, 111 S. Ct. 2546, 2555 & n.1, 115 L. Ed. 2d 640 (1991); <u>Caniff v. Moore</u>, 269 F.3d 1245, 1247 (11th Cir. 2001) ("[C]laims that have been held to be procedurally defaulted under state law cannot be addressed by federal courts."); <u>Chambers v. Thompson</u>, 150 F.3d 1324, 1326–27 (11th Cir. 1998) (applicable state procedural bar should be enforced by federal court even as to a claim which has never been presented to a state court); *accord* <u>Tower v. Phillips</u>, 7 F.3d 206, 210 (11th Cir. 1993); <u>Parker v. Dugger</u>, 876 F.2d 1470 (11th Cir. 1990), *rev'd on other grounds*, 498 U.S. 308, 111 S. Ct. 731, 112

---

to meet the fair presentment requirement and noted that it was important that the petitioner had never mentioned the federal standards regarding extraneous materials in his brief, but relied on state law for his arguments.  *Id.*

L. Ed. 2d 812 (1991).  In the first instance, the federal court must determine whether any future attempt to exhaust state remedies would be futile under the state's procedural default doctrine. Bailey, 172 F.3d at 1303.  In the second instance, a federal court must determine whether the state's procedural default ruling rested on adequate state grounds independent of the federal question.  *See* Harris v. Reed, 489 U.S. 255, 109 S. Ct. 1038, 1043, 103 L. Ed. 2d 308 (1989).  The adequacy of a state procedural bar to the assertion of a federal question is itself a federal question.  Lee v. Kemna, 534 U.S. 362, 122 S. Ct. 877, 885, 151 L. Ed. 2d 820 (2002).  The adequacy requirement has been interpreted to mean that the rule must be "firmly established and regularly followed," Siebert v. Allen, 455 F.3d 1269, 1271 (11th Cir. 2006), that is, not applied in an "arbitrary or unprecedented fashion," Judd v. Haley, 250 F.3d 1308,1313 (11th Cir. 2001), or in a manifestly unfair manner.  Ford v. Georgia, 498 U.S. 411, 424–25, 111 S. Ct. 850, 858, 112 L. Ed. 2d 935 (1991); Upshaw v. Singletary, 70 F.3d 576, 579 (11th Cir. 1995).

The Eleventh Circuit has set forth a three-part test to determine whether a state court's procedural ruling constitutes an independent and adequate state rule of decision.  Judd v. Haley, 250 F.3d 1308, 1313 (11th Cir. 2001).  First, the last state court rendering judgment must clearly and expressly state it is relying on state procedural rules to resolve the federal claim.[5]  Second, the state court's decision on the procedural issue must rest entirely on state law grounds and not be intertwined with an interpretation of federal law.  Third, the state procedural rule must be adequate. *Id.*  The adequacy requirement has been interpreted to mean the rule must be firmly established and regularly followed, that is, not applied in an arbitrary or unprecedented fashion.  *Id.*

To overcome a procedural default such that the federal habeas court may consider the merits of a claim, the petitioner must show cause for the default and prejudice resulting therefrom or a fundamental miscarriage of justice.  Tower, 7 F.3d at 210; Parker, 876 F.2d 1470.  "For cause to exist, an external impediment, whether it be governmental interference or the reasonable unavailability of the factual basis for the claim, must have prevented petitioner from raising the claim."  McCleskey v. Zant, 499 U.S. 467, 497, 111 S. Ct. 1454, 1472, 113 L. Ed. 2d 517 (1991)

---

[5] The federal court should honor the procedural bar even if the state court alternatively reviewed the claim on the merits.  Marek v. Singletary, 62 F.3d 1295, 1302 (11th Cir. 1995); Alderman v. Zant, 22 F.3d 1541 (11th Cir. 1994).

(quoting Murray v. Carrier, 477 U.S. 478, 488, 106 S. Ct. 2639, 2645, 91 L. Ed. 2d 397 (1986)).  To satisfy the miscarriage of justice exception, the petitioner must show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent."  Schlup v. Delo, 513 U.S. 298, 327, 115 S. Ct. 85, 130 L. Ed. 2d 808 (1995).  "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him."  Schlup, 513 U.S. at 327.  Further:

> a substantial claim that constitutional error has caused the conviction of an innocent person is extremely rare.  To be credible, such a claim requires [a] petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial.

Id.  Although a habeas petitioner asserting a convincing claim of actual innocence need not prove diligence to overcome a procedural bar, timing is a factor relevant in evaluating the reliability of a petitioner's proof of innocence.  See McQuiggin v. Perkins, — U.S. —, 133 S. Ct. 1924, 1935, 185 L. Ed. 2d 1019 (2013).  As the Court stated in Schlup, "[a] court may consider how the timing of the submission and the likely credibility of [a petitioner's] affiants bear on the probable reliability of . . . evidence [of actual innocence]."  513 U.S. at 332; see also House, 547 U.S. at 537.

Within this framework, the court will review Petitioner's claims.

IV.    PETITIONER'S CLAIMS

A.    Ground One:  "Trial court erred in not ruling on merits of Petitioner's motion to correct sentencing error.  Mootness does not destroy court's jurisdiction where actual controversy still exists."

Petitioner alleges after he was resentenced on February 23, 2012, on the robbery count, he filed a motion to correct sentencing error alleging the following grounds for relief:  (1) the sentencing court failed to allow him to present mitigation witnesses, (2) the sentencing scoresheet improperly calculated his prior criminal history, and (3) the trial court's order modifying his robbery sentence on October 11, 1999, was void and entered in violation of his federal due process rights (doc. 19 at 5–7).[6]  He asserts the state circuit court determined that the first ground was not

---

[6] The page references used in this Report reflect the page numbers as enumerated in the court's electronic docketing system rather than those the parties may have assigned in their pleadings.

cognizable in a Rule 3.800(b) motion, and denied the second and third grounds as moot (*id.*). Petitioner states he appealed the decision to the First DCA, and the appellate court affirmed (*id.*).

Respondent contends Ground One is moot, because Petitioner's claims concern only his sentence on the robbery count, not the conviction, and his sentence on the robbery count expired prior to his filing this habeas action (doc. 22 at 24–26).

Petitioner contends the issues are not moot, because despite the fact that his <u>sentence</u> on the robbery conviction is expired, he is still in custody on the murder <u>conviction</u> and suffers continuing collateral consequences from the robbery conviction (doc. 19 at 7; doc. 26 at 5–6).

Whether an action is moot is a jurisdictional matter because it implicates the Article III requirement that there be a live case or controversy. <u>United States Parole Comm'n v. Geraghty</u>, 445 U.S. 388, 395–96, 100 S. Ct. 1202, 63 L. Ed. 2d 479 (1980); <u>Bailey v. Southerland</u>, 821 F.2d 277, 278 (5th Cir. 1987). This case-or-controversy limitation serves "two complementary" purposes—it limits the business of federal courts to "questions presented in an adversary context and in a form historically viewed as capable of resolution through the judicial process," and it defines the "role assigned to the judiciary in a tripartite allocation of power to assure that the federal courts will not intrude into areas committed to the other branches of government." <u>Geraghty</u>, 445 U.S. at 396 (internal quotations and citation omitted). Likewise, mootness has two aspects: "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Id.* (internal quotations and citation omitted). Thus, if an event occurring after the filing of the lawsuit deprives "the court of the ability to give the plaintiff or appellant meaningful relief, then the case is moot and must be dismissed." <u>Soliman v. United States ex rel. INS</u>, 296 F.3d 1237, 1242 (11th Cir. 2002) (internal quotation marks and citation omitted); *see also* <u>Spencer v. Kemna</u>, 523 U.S. 1, 7, 118 S. Ct. 978, 140 L. Ed. 2d 43 (1998) ("Throughout the litigation, the plaintiff 'must have suffered or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision.'" (citation omitted)).

"[A] habeas petitioner who has been released from imprisonment subsequent to his filing a § 2254 petition must establish that his petition still presents a case or controversy under Article III, § 2, of the United States Constitution, and therefore is not moot." <u>Mattern v. Sec'y for Dep't of Corr.</u>, 494 F.3d 1282, 1285 (11th Cir. 2007). In circumstances analogous to those here, the Supreme

Court held that a habeas petition challenging the validity of a parole revocation was rendered moot by the expiration of the petitioner's parole revocation sentence during the pendency of the habeas proceeding.  *See* Spencer, 523 U.S. at 14.  In Spencer, a state prisoner filed a federal habeas petition seeking to invalidate an order revoking his parole on the grounds that he was denied due process in the parole revocation proceeding.   During the pendency of the habeas proceeding, Spencer completed his term of imprisonment underlying the parole revocation, was re-released on parole, and completed the parole term.  The district court dismissed the petition, and the United States Court of Appeals for the Eighth Circuit affirmed, concluding that Spencer's claim had become moot because Spencer suffered no "collateral consequences" of the revocation order.  *Id.*, 523 U.S. at 5–6. The Supreme Court agreed that Spencer's challenge to the parole revocation order was moot, explaining:

> An incarcerated convict's (or a parolee's) challenge to the validity of his conviction always satisfies [Article III's] case-or-controversy requirement, because the incarceration (or the restriction imposed by the terms of the parole) constitutes a concrete injury, caused by the conviction and redressable by invalidation of the conviction.  Once the convict's sentence has expired, however, some concrete and continuing injury other than the now-ended incarceration or parole—some "collateral consequence" of the conviction—must exist if the suit is to be maintained.  *See, e.g.*, Carafas, *supra*, at 237–238, 88 S. Ct., at 1559–60.

523 U.S. at 7 (citing Carafas v. La Vallee, 391 U.S. 234, 88 S. Ct. 1556, 20 L. Ed. 2d 554 (1968)). The Court held that although it had been willing to presume the existence of collateral consequences when a petition challenged the validity of a criminal conviction, it would not extend that presumption to a petition challenging the validity of a parole revocation.  Instead, when a petitioner attacking the termination of his parole status is released from custody during the pendency of his habeas proceeding due to the expiration of his parole revocation sentence, the petitioner must prove the existence of continuing "collateral consequences" of the parole revocation in order to meet Article III's standing requirement.  *Id.* at 14; *see also* Lane v. Williams, 455 U.S. 624, 631, 102 S. Ct. 1322, 71 L. Ed. 2d 508 (1982) (involving due process challenge to parole term that became moot when petitioner's parole term ended while the case was on appeal to the Sixth Circuit).  The Court rejected Spencer's arguments that there were a number of possible injuries he could suffer in the future on account of the parole revocation, finding that Spencer's asserted injuries were mere

possibilities as opposed to certainties.  Spencer, 523 U.S. at 14–18 (rejecting petitioner's assertions that he continued to suffer collateral consequences of his parole revocation because the revocation could be used to his detriment in a future parole proceeding, could be used to increase his sentence in a future sentencing proceeding, or might be used against him in subsequent proceedings in which he might appear as a witness or defendant; the asserted injuries were not concrete injuries-in-fact sufficient to satisfy Article III's case-or-controversy requirement).

Here, in Ground One, Petitioner does not attack his underlying conviction for robbery; he challenges only the sentence imposed by the trial court upon resentencing.  His ultimate objective is another resentencing on the robbery conviction; indeed, in his Rule 3.800(b) motion he requested that he be resentenced to 55.8 months of imprisonment on the robbery count (see Ex. T at 108–14).  Because Petitioner's sentence on the robbery conviction has expired, there is no longer a case or controversy to litigate.  A favorable decision on the merits of Ground One would not entitle Petitioner to any additional relief, and therefore he no longer has a "personal stake in the outcome."  See Hernandez v. Wainwright, 796 F.2d 389, 390 (11th Cir. 1986) (holding habeas petition moot where petitioner attacked state's calculation of gain time credits, and petitioner was no longer in custody); Graham v. United States Parole Comm'n, 732 F.2d 849, 850 (11th Cir. 1984) (dismissing habeas petition as moot where petitioner ultimately sought release on parole and was released during pendency of habeas action) (quotations omitted); see also Diaz v. Kinkela, 253 F.3d 241, 243–44 (6th Cir. 2001) (holding federal habeas petition moot where petitioner challenged additional period of incarceration for "bad time," but petitioner was released from prison during pendency of proceeding after serving the additional "bad time"); Aragon v. Shanks, 144 F.3d 690, 692 (10th Cir. 1998) (holding federal habeas petition moot where petitioner challenged state's application of good time credits, but petitioner had completed his term of incarceration and a favorable decision would not reduce his probationary period); see also, e.g., Wharton v. Hood, 23 F. App'x 841 (9th Cir. 2001) (unpublished) (finding habeas petition moot where petitioner challenged computation of good time credits, and petitioner had been released from custody); Graham v. Duckworth, 175 F.3d 1019, 1999 WL 147109, at *1 (7th Cir. 1999) (unpublished) (same); United States v. Goss, 96 F. App'x 365 (6th Cir. 2004) (unpublished) (concluding that defendant's objections to sentencing calculation

were moot once he had served his sentence of six-months incarceration and four-months house arrest).

Furthermore, although Petitioner generally alleges he continues to suffer collateral consequences from the robbery <u>conviction</u>, he does not identify any collateral consequences he is suffering from the expired <u>sentence</u>, and even if he did so allege, the mere possibility of future consequences is too speculative to give rise to a case or controversy.[7] *See* Graham, 732 F.2d at 850; Bailey, 821 F.2d at 279 (request for expungement of prison disciplinary record rendered moot by prisoner's release from incarceration; mere possibility of future consequences was too speculative to give rise to case or controversy).  Therefore, Ground One is properly denied as moot.

B. Ground Two:  "Counsel ineffective for misadvising/overburdening/discouraging Defendant's will to testify in his own behalf as Defendant [sic] testimony was his only defense, violating Defendant's 5th, 6th, and 14th Constitutioned [sic] Amendment rights."

Petitioner alleges that during his trial, the State presented testimony from numerous witnesses, including key witnesses Herman Levins, Willie Booker, and Kevin Boyington (doc. 19 at 8–14).  He alleges after Willie Booker testified, the court declared a recess, during which he informed defense counsel he wished to testify and asked counsel when he would be able to do so (*id.*).  Petitioner alleges counsel responded, "We will see after the recess." (*id.*).  Petitioner alleges that the trial resumed, and the State called Kevin Boyington (*id.*).  He alleges the State rested its case after Boyington's testimony, and defense counsel rested without calling him or any other witness to testify (*id.*).  Petitioner alleges at that point, he told defense counsel he wanted to testify because no one had testified to his version of the events, and his version of the events was crucial to

_____

[7] "Collateral consequences" may keep a controversy alive when a habeas petitioner challenges the propriety of his conviction. *Compare* Sibron v. New York, 392 U.S. 40, 55, 88 S. Ct. 1889, 20 L. Ed. 2d 917 (1968) (holding that habeas action in which petitioner challenges propriety of conviction is not rendered moot by petitioner's release from incarceration because collateral consequences of conviction exist, including rendering petitioner unable to engage in certain businesses or serve as official in labor union, rendering him ineligible to serve as juror, subsequently increasing current sentence under state recidivist law, or possibly resulting in revocation of business license); *with* Lane, 455 U.S. at 631 (refusing to extend presumption of collateral consequences (or willingness to accept hypothetical consequences) to prisoner's challenge to parole portion of sentence and not conviction, thereby requiring habeas petitioner to prove existence of collateral consequences to overcome mootness issue that arose upon expiration of sentence); *and* Spencer, 523 U.S. at 14 (holding that habeas petitioner challenging parole revocation after his sentence had expired must specifically identify concrete disadvantages or disabilities that had in fact occurred, that were imminently threatened, or that were imposed as a matter of law, and that were attributable to the parole revocation).  In the instant case, as previously noted, Petitioner does not challenge the propriety of his robbery conviction; he challenges only the trial court's failure to award him credit on his now-expired sentence.

establishing a defense to the charges (*id.*).  Petitioner alleges counsel responded that it was too late, and his testimony was not needed (*id.*).  Petitioner alleges counsel did not advise him of the reasons he should not testify, the strategic implications of his testifying or not testifying, or that the decision of whether to testify was ultimately Petitioner's decision (*see* doc. 26 at 7–10).

Petitioner (also referred to below as "Carson") alleges if he had testified, he would have stated the following:

> 1) He never told Herman Levins to pass him the wallet of the robbery victim nor did Levins see him pull a gun on Kevin Boyington or ask him for his money. [Reference to trial transcript, p. 173.]

> 2) He never went with Kelvin Brown or Levins to Levins's house where Brown retrieved a gun.   [Reference to trial transcript, p. 172.]

> 3) [He] would have testified that he never handed a gun off to Kevin [sic] Brown.

> 4) He never told Herman Levins he was mad because he lost all his money gambling prior to incident [sic] but would have testified that he was tired of people using and selling drugs in his deceased grandmother's trailer.  This part of Carson's testimony would have negated the motive element for the armed robbery count. [Reference to trial transcript, p. 172.]

> 5) Carson would have rebutted Levins [sic] stating that Carson was standing next to Brown before the shooting started and told Levins to "look out, get out the way." Carson would have testified he was headed back to the trailer to see if anybody was left inside from when he previously put everybody out [sic] when the shots first started.  [Reference to trial transcript, p. 175.]

> 6) Carson would have rebutted Willie Booker's testimony as to the only time he was in the trailer with Boyington and Wright and testified that he was in there with them to make them get out because they were smoking drugs in his deceased grandmother's trailer.  [Reference to trial transcript, p. 345.]

> 7) Carson would have testified that he never tussled with Booker outside in the yard and that any verbal confrontation with Booker happened inside the trailer.  Also Booker never heard him outside the trailer arguing with someone. [Reference to trial transcript, p. 347.]

> 8) Carson would have testified that Booker never saw a gun in his hand nor did Booker see Carson hand a gun to Brown. [Reference to trial transcript, p. 347.]

9) Carson would have testified that he was never sent by Booker to sell drugs to Boyington because he didn't have any drugs.  He only wanted everybody out because they were smoking drugs in his deceased grandmother's trailer. [Reference to trial transcript, p. 345.]

10) Carson would have testified, to refute Kevin Boyington's testimony, that Boyington never saw him tussle with Booker.

11) Carson would have testified that Boyington never saw him rob Anthony Wright of beer.  [Reference to trial transcript, p. 369.]

12) Carson would have testified that Boyington never heard or saw him tell Levins to get his wallet or that he had a gun that allegedly was pointed at Boyington. [Reference to trial transcript, p. 367.]

13) Carson would have testified that Boyington never saw Booker try to take a gun away from Carson as he never had a gun in his possession.  [Reference to trial transcript, p. 369.]

(doc. 19 at 10–12).  Petitioner alleges Kevin Boyington gave inconsistent pre-trial statements regarding the identity of the robber and the shooter; for example, Boyington told police and the grand jury that Kelvin Brown was the shooter and robber, but Boyington stated in his deposition that Kelvin Brown was the shooter but Petitioner was the robber (*id.* at 12).  Petitioner alleges at trial, Boyington testified that Petitioner pointed a gun at him and robbed him (*id.*).  As to Willie Booker, Petitioner alleges the State had to correct his trial testimony with his deposition testimony (*id.*). Petitioner alleges Booker initially testified he did not see Petitioner rob anyone, so the prosecutor impeached him with his deposition testimony that Booker "thought" that Petitioner and another man were preparing to commit a robbery (*id.*).  Petitioner alleges Booker admitted at trial that he had been drinking alcohol and smoking crack cocaine when the robbery and murder occurred, and Booker admitted in his deposition that his perception and memory of the events that night might not have been accurate because he was "half asleep and half intoxicated" (*id.*).  Petitioner alleges Herman Levins gave inconsistent accounts of the robbery and murder in his statements to police, deposition, grand jury testimony, and trial testimony (*id.* at 13).

Petitioner contends counsel's advice that his testimony was unnecessary and/or too late discouraged him from testifying and caused him to waive his right to testify (doc. 19 at 13–14; doc.

26 at 7–10).  He alleges without his testimony, there was no evidence to dispute the State's evidence or prove that he was not a principal in the robbery and murder (*id.*).  He contends if counsel had not erroneously discouraged him from testifying, the result of the trial would have been different (*id.*).

Petitioner concedes he has not presented this ineffective assistance of trial counsel ("IATC") claim to the state courts (doc. 19 at 8, 15–17; doc. 26 at 7–10).  He alleges his failure to raise the claim in his first Rule 3.850 motion was caused by ineffective assistance of post-conviction counsel; therefore, he is entitled to federal review of his claim pursuant to <u>Martinez v. Ryan</u>, 132 S. Ct. 1309 (2012) (*id.*).

Respondent contends Ground Two is unexhausted and procedurally barred (doc. 22 at 27–28).  Respondent contends Petitioner is not entitled to review under <u>Martinez</u>, because his allegations are insufficient to show that his post-conviction counsel was ineffective (*id.* at 29–32).  For example, Petitioner does not explain how his post-conviction counsel performed deficiently, how Petitioner was prejudiced by the alleged deficiency, or that he told counsel about his claim of being discouraged from testifying (*id.*).  Respondent contends even if Petitioner's claim was sufficient, he failed to show that his post-conviction counsel was deficient or that his underlying IATC claim was substantial (*id.* at 32–35).  Respondent states the habitual offender notice, which is part of the state court record, shows that Petitioner had at least two prior felony convictions (*id.*).  Respondent contends discouraging a defendant with prior convictions from testifying can be a reasonable decision (*id.*).  Respondent additionally asserts it does not appear Petitioner's testimony would have affected the outcome of trial, because the jury was presented with Petitioner's statement to law enforcement (*id.*).

In Petitioner's reply, he alleges he advised post-conviction counsel of the facts underlying his IATC claim during counsel's two visits with him at Okaloosa Correctional Institution (doc. 26 at 6).  Petitioner contends his post-conviction counsel was deficient for failing to develop the factual basis for this claim and present it in the first Rule 3.850 motion (*id.* at 7–10).  Petitioner contends if counsel had presented the IATC claim, the result of the post-conviction proceeding would have been different (*id.*).

As previously discussed, a federal court may consider the merits of a procedurally defaulted claim if the petitioner can show both "cause" for the default and "prejudice" from a violation of his

constitutional right. Wainwright v. Sykes, 433 U.S. 72, 84–85, 97 S. Ct. 2497, 53 L. Ed. 2d 594 (1977). To establish cause, a petitioner must ordinarily "demonstrate 'some objective factor external to the defense' that impeded his effort to raise the claim properly in state court." Ward v. Hall, 592 F.3d 1144, 1157 (11th Cir. 2010) (quoting Murray, 477 U.S. at 488). Before its 2012 decision in Martinez, the Supreme Court had long held that § 2254 petitioners cannot rely on errors made by their state collateral counsel to establish cause. See Coleman, 501 U.S. at 752–53. Martinez created a limited, equitable exception to Coleman where, (1) "a State requires a prisoner to raise an ineffective-assistance-of-trial-counsel claim in a collateral proceeding," as opposed to on direct appeal; (2) "appointed counsel in the initial-review collateral proceeding, where the claim should have been raised, was ineffective under the standards of Strickland [v. Washington, 466 U.S. 668 (1984)]"; and (3) "the underlying ineffective-assistance-of-trial-counsel claim is a substantial one." Martinez, 132 S. Ct. at 1318–19 (citations omitted). Accordingly, the petitioner must "establish that his collateral counsel's conduct 'fell below an objective standard of reasonableness,' and that, 'but for counsel's unprofessional errors, the result of the proceeding would have been different.'" Hittson v. GDCP Warden, 759 F.3d 1210, 1262 (11th Cir. 2014) (quoting Strickland, 466 U.S. at 688).

In Hittson, the Eleventh Circuit explained:

[T]he merits of the underlying claim is only a part of the Strickland analysis. With unlimited time and the benefit of hindsight, a petitioner can come up with any number of potentially meritorious ineffective-assistance claims that he now wishes his collateral counsel had raised. However, a petitioner does not establish constitutionally defective performance simply by showing that (a) potentially meritorious claims existed and (b) his collateral counsel failed to raise those claims. Murray, 477 U.S. at 486, 106 S. Ct. at 2644 ("[T]he mere fact that counsel failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it, does not constitute cause for a procedural default."). "Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues." Jones v. Barnes, 463 U.S. 745, 751–52, 103 S. Ct. 3308, 3313, 77 L. Ed. 2d 987 (1983). "[A] per se rule that . . . the professional advocate, [is not] allowed to decide what issues are to be pressed . . . seriously undermines the ability of counsel to present the client's case in accord with counsel's professional evaluation." Id. at 751, 103 S. Ct. at 3313.

As we have explained, <u>Strickland</u> instructs courts to "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance"—that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." 466 U.S. at 689–90, 104 S. Ct. at 2065–66.  To overcome this presumption, a petitioner must "establish that no competent counsel would have taken the action that his counsel did take." <u>Chandler v. United States</u>, 218 F.3d 1305, 1315 (11th Cir. 2000) (en banc).

Thus, to show that his habeas counsel failed to provide the level of representation required by <u>Strickland</u>, [the petitioner] must show more than the mere fact [he] failed to raise potentially meritorious claims; he must show that no competent counsel, in the exercise of reasonable professional judgment, would have omitted those claims.

<u>Hittson</u>, 759 F.3d at 1263 (footnote omitted).

The Eleventh Circuit then explained <u>Martinez</u>'s "substantial claim" requirement:

<u>Martinez</u> articulated the "substantial claim" requirement as follows:

To overcome the default, a prisoner must . . . demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit.  *Cf.* <u>Miller–El v. Cockrell</u>, 537 U.S. 322, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (describing standards for certificates of appealability to issue).

<u>Martinez</u>, — U.S. at —, 132 S. Ct. at 1318–19.  Neither <u>Martinez</u> nor <u>Trevino</u> [v. Thaler], — U.S. —, 133 S. Ct. 1911, 185 L. Ed. 2d 1044 (2013)] elaborated on or applied this standard, but we take the Court's reference to <u>Miller–El</u> to mean that it intended that lower courts apply the already-developed standard for issuing a COA, which requires "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).

As the Court explained in <u>Miller–El</u>, "[a] petitioner satisfies this standard by demonstrating . . . that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  537 U.S. at 327, 123 S. Ct. at 1034.  Where a petitioner must make a "substantial showing" without the benefit of a merits determination by an earlier court, he must demonstrate that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right."  <u>Slack v. McDaniel</u>, 529 U.S. 473, 484, 120 S. Ct. 1595, 1604, 146 L. Ed. 2d 542 (2000).  That does not mean that a petitioner must show "that some jurists would grant the petition." <u>Miller–El</u>, 537 U.S. at 338, 123 S. Ct. at 1040.

"[A] claim can be debatable even though every jurist of reason might agree, after the . . . case has received full consideration, that petitioner will not prevail." *Id.*

We observe that this standard is similar to the preliminary review conducted by district judges in § 2254 proceedings. Rule 4 of the § 2254 Rules allows the district judge to summarily dismiss a petition "[i]f it plainly appears from the petition and any attached exhibits that the petitioner is not entitled to relief." The Advisory Committee Notes further instruct that, in keeping with the heightened, fact-pleading requirement in habeas cases, "the petition is expected to state facts that point to a real possibility of constitutional error." Advisory Committee Note to Rule 4 of the Rules Governing Section 2254 Cases (quotation marks omitted).

Thus, we examine the allegations in . . . the § 2254 petition to see whether "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right." In making this determination, we consider the fact-pleading requirement for § 2254 petitions, and the standard from <u>Strickland</u>.

<u>Hittson</u>, 759 F.3d at 1269–70 (footnotes omitted).

To determine whether Petitioner's collateral counsel was ineffective for failing to raise the IATC claim that trial counsel deprived Petitioner of his right to testify, the court must examine the evidence presented at Petitioner's trial. According to the record, the robbery and murder occurred at approximately 5:00–5:30 a.m. on August 10, 1996 (*see* Ex. A at 1). Petitioner was originally charged on September 11, 1996, with aggravated assault and battery of Willie Booker, his uncle (*see id.*). However, two months later, on November 19, 1996, Petitioner, Kelvin Brown, and Herman Levins were indicted on charges of first degree premeditated or felony murder with a weapon for the killing of Anthony Wright, and armed robbery with a firearm for the robbery of Anthony Wright and/or Kevin Boyington (*id.* at 2–4). At Petitioner's trial, the State stipulated that Kelvin Brown actually shot Anthony Wright (Ex. B at 378); therefore, the question for the jury was whether Petitioner was a principal to the murder and whether he committed the armed robbery.[8]

---

[8] To prove Petitioner's guilt, the State was required to prove beyond a reasonable doubt that Petitioner and Kelvin Brown and/or Herman Levins were principals in the commission of an armed robbery (meaning, Petitioner had a conscious intent that the armed robbery be committed, and he did some act or said some word which was intended to, and which did, incite, cause, encourage, assist, or advise the other person or persons to actually commit or attempt to commit the armed robbery) and either (1) Anthony Wright's death occurred as a consequence of and while Petitioner was engaged in the commission of armed robbery, or (2) the death occurred as a consequence of and while Petitioner was attempting to commit an armed robbery, or (3) the death occurred as a consequence of and while Petitioner or an accomplice was escaping from the immediate scene of an armed robbery (*see* Ex. B at 509–11).

The evidence linking Petitioner to the robbery and murder was testimony of Herman Levins, Willie Booker, and Kevin Boyington.  Herman Levins testified he knew Kelvin Brown and Petitioner because they grew up together (Ex. B at 169–79).  Levins testified that on the night of the murder, he was with Kelvin Brown and Kelvin "Keokie" Simmons.  He testified that they saw Petitioner when they were on their way to "the blocks" and stopped and talked to him briefly.  He testified Petitioner walked away and became involved in a dice game, and he and the other two men went to "the blocks" for ten or fifteen minutes.  Levins testified they left "the blocks," and Keokie Simmons dropped off him and Kelvin Brown at Willie Booker's trailer, which is located in an area called "the bottom."  Levins testified he and Kelvin Brown were standing around drinking beer, and Petitioner drove up approximately ten minutes later.  He testified Petitioner was "kind of mad" and said he had lost some money.  Levins testified Petitioner went into the trailer, came out, talked to Kelvin Brown, and then the three of them left for Levins's house in Petitioner's car.  Levins testified that when they were near his house, Kelvin Brown exited Petitioner's car, walked behind Levins's house, and returned with a gun.  Levins testified the three of them returned to Willie Booker's trailer and got out of the car.  He testified Petitioner went into the trailer, and then Kevin Boyington, Anthony Wright, and "all of them" started coming out of the trailer.  Levins testified that once everyone was outside, Petitioner pulled a gun on Kevin Boyington and asked him for his money.  Levins testified Boyington pulled out his wallet and placed it on the car.  Levins testified Petitioner instructed him (Levins) to get the wallet, so Levins handed Petitioner the wallet.  Levins testified Petitioner put Boyington's wallet in his pocket.  Levins testified Petitioner then told Boyington to give him all his money, so Boyington reached in his pocket and pulled out a lot of money.  Levins testified Petitioner grabbed the money and put it in his pocket.  Levins testified that Willie Booker, Petitioner's uncle, grabbed Petitioner, and the two men started "tussling."  Levins testified Petitioner had Kelvin Brown's gun, and Petitioner and Booker went out into the street, and Petitioner pushed Booker down.  Levins testified Booker got up and walked around the corner saying he was going to call the police.  Levins testified Petitioner walked back to where Levins and the others were standing, and by that time, Levins and Anthony Wright were arguing.  Levins testified Anthony Wright had robbed him a year or two ago, and that was the first time he had seen Wright since the robbery.  Levins testified he threw a beer bottle at Anthony Wright, but the bottle missed him and

went inside Wright's car.  Levins testified that Petitioner told everyone to leave, and by that time, Kelvin Brown had the gun.  Levins testified Kevin Boyington left first, and Kelvin Brown fired some shots at him.  Then Anthony Wright backed his car out, and Kelvin Brown fired some shots at him too.  Levins testified that Anthony Wright's car crashed.  Levins testified Petitioner was standing "a little off" from Kelvin Brown when Brown was firing the gun.  Levins testified that before Brown began shooting, Petitioner warned him (Levins) to get out of the way.  Levins admitted he was originally charged in the murder case, and he pleaded guilty to aggravated assault and accessory to armed robbery.  He testified he was sentenced to thirteen months in the county jail, two years of house arrest, and four years of probation.[9]

On cross-examination, Levins admitted that everyone in the neighborhood called Willie Booker "Unc" or "Uncle," and that Booker called everyone in the neighborhood "Nephew," including Kelvin Brown, Petitioner, and Levins himself (Ex. B at 180).  Levins admitted he did not see Petitioner play dice, he did not know what the stakes were, and he did not know whether Petitioner lost any money (*id.* at 180–98).  Levins testified that prior to him, Kelvin Brown, and Petitioner's leaving Booker's house in Petitioner's car, Petitioner and Kelvin Brown talked, but he (Levins) did not hear what they said, even though he was standing with them.  Levins testified that there was no conversation among the three of them when they were in Petitioner's car, when Brown got out the car, or when Brown returned with the gun.  He testified he saw the gun, but had no idea what Kelvin Brown was going to do.  Levins testified that when they returned to Booker's trailer and Petitioner went inside, Petitioner and Booker were arguing about people smoking crack in the trailer, which was owned by Petitioner's grandmother.  Levins testified that Petitioner told the people smoking crack to leave the trailer, and then Kevin Boyington, Anthony Wright, Petitioner, and Booker came out of the trailer.  Levins testified that the gun Petitioner used to rob Kevin Boyington was the same gun Kelvin Brown had retrieved from behind Levins's house, but Levins stated he did not see the gun change hands from Brown to Petitioner.  Levins testified he saw

---

[9] According to the on-line public docket of the Escambia County Clerk of Court, on March 26, 1998, one month after Petitioner's trial and just days after his sentencing, Petitioner's other co-defendant, Kelvin Brown, was convicted of manslaughter and acquitted of armed robbery.  *See* www.escambiaclerk.com/.  He was sentenced to sixteen years in prison, with credit for one year and 226 days, but was subsequently resentenced to 99.5 months in prison and 99.5 months of probation, with credit for two years and 69 days plus any time previously served.  *Id.*

Petitioner hand the gun to Kelvin Brown while Petitioner was "tussling" with Willie Booker.  Levins testified he immediately recognized Anthony Wright as the person who previously robbed him of money and crack cocaine, but it was not until after Willie Booker left that he (Levins) began arguing with Wright and demanded his money back.  Levins testified his altercation with Wright became physical, but he denied that he pulled a gun on Wright, or that Kelvin Brown attempted to help him by pulling the gun on Wright.  Levins testified that the argument broke up when Petitioner told Boyington and Wright to leave.  He testified Petitioner owned a Marquis and drove it the night of the robbery and shooting.

Defense counsel impeached Herman Levins's credibility by pointing out contradictions and inconsistencies in his trial testimony as compared to his grand jury testimony, sworn deposition, and statements to police (Ex. B at 199–239).  For example, in Levins's first interview with police, he did not mention Kevin Boyington or the robbery; instead, he only discussed the "push-and-shove match" between Petitioner and Willie Booker.  Levins additionally admitted that he initially did not tell police about a gun.  He also admitted he did not tell police that after he, Kelvin Brown, and Petitioner left the scene, he and Kelvin Brown bought some cocaine and snorted it at Angela Hopkins's house.  Levins admitted he testified to the grand jury that he never saw Petitioner with the gun.  He also admitted he testified to the grand jury that Petitioner was in the trailer when the first shots were fired.  Levins admitted he testified to the grand jury that he did not see who fired the gun.  Levins also admitted he lied during his deposition when he stated he did not see a gun that night.  Levins admitted that it was not until after he was indicted and arrested for the murder and robbery that he told police that Petitioner put a gun in Kevin Boyington's face and took Boyington's wallet after Boyington placed it on the car.  Levins admitted to the jury that he had not been charged with perjury, making a false statement in an official proceeding, or obstruction of justice, even though he lied to the grand jury, in his deposition, and to police.

Defense counsel also elicited testimony from Levins that he was originally charged as a co-defendant in the case but did not tell police or prosecutors that Petitioner was involved in the robbery and murder until he (Levins) knew that the robbery victim, Kevin Boyington, could not identify him; and upon his telling prosecutors that Petitioner was involved, he was dismissed from the case, and prosecutors charged him with aggravated assault and accessory after-the-fact, to which

he pleaded guilty and was released from jail two to three weeks later.  Levins admitted that the day after he pleaded guilty, the prosecutor listed him as a witness in Petitioner's case.  He also admitted that he knew that the government wanted to hear that Kelvin Brown was the shooter (because Brown confessed to the shooting the day after it occurred), and that he (Levins) and Petitioner were involved.

Willie Booker testified he was Petitioner's uncle, and he identified Petitioner in court as his nephew (Ex. B at 342–47).  Booker testified he was currently in jail for murder (unrelated to the killing of Anthony Wright), and he entered a plea but had not been sentenced.  He testified that on August 10, 1996, Anthony Wright and Kevin Boyington came to his trailer because Boyington wanted to buy drugs.  Booker testified he helped Boyington buy drugs by sending Kelvin Brown, Petitioner, Herman Levins, and Chris Gill to deal with Boyington.  Booker testified Boyington bought some drugs.  Booker testified that Petitioner, Kelvin Brown, Herman Levins, Anthony Wright, and Kevin Boyington were in his yard just before dawn.  He testified he heard arguing in his yard, so he ran out to see what was going on.  Booker testified he began wrestling with Petitioner and saw a gun in Petitioner's hand.

On cross-examination, Willie Booker admitted that he had been smoking crack all day and drank a case of beer (Ex. B at 347–61).  Booker admitted he was charged with first degree murder, which carried a life sentence, but he entered an agreement with the State that his sentence would be capped at twenty years if he pleaded guilty.  Booker testified he did not see Petitioner rob anyone that night.  He testified that after he saw the gun in Petitioner's hand, it fell onto the ground, and Kelvin Brown picked it up.  Booker testified he knew that Herman Levins was robbed by Anthony Wright two years prior, and he saw Levins and Wright get into an argument on the night Wright was murdered.

On re-direct examination, Willie Booker admitted that he stated during his deposition that the reason he ran out of his trailer into the yard was because he thought "they were fixing [sic] to do something stupid, rob them, or they were fixing to go do something, rob somebody.  I ain't know what." (Ex. B at 362).

Kevin Boyington testified that Anthony Wright helped him buy crack cocaine from Willie Booker on August 10, 1996.  He testified he was a drug dealer and sold powder cocaine, but he went

to Booker's trailer to buy crack cocaine (Ex. B at 363–74).  He testified that four or five guys came into the trailer to try to sell him crack cocaine, but he bought it from a guy named Chris, because he had made previous drug purchases from Chris.  He testified he bought some crack, and he and Anthony Wright smoked some of it, and then they went to a bottle club for a couple of hours.  He testified they left the club and parked in front of Anthony's grandmother's house and smoked more crack.  He testified they went back to Willie Booker's trailer.  He testified they got out of the car and heard a gunshot, and as he turned, he saw a gun pointed at him and a person requesting his wallet. Boyington testified the person told him to put his wallet on the car, so he did.  He testified that one guy was holding the gun on him, and another guy took the wallet from on top of the car, looked in it, and said there was no money in it.  Boyington testified, "when he said there was no money in it, he said come on, give me your money, I know you got some."  Boyington testified Anthony Wright told the men that Boyington had no money and to leave him alone.  He testified the man with the gun told Wright, "I ain't kidding with you.  If he [Boyington] ain't got no money, give us yours." Boyington testified Anthony Wright said he didn't have any money, so the man with the gun demanded that Wright give them his beer, so Wright set down the beer he was carrying, and the men took the beer.  Boyington testified that while this was occurring, Willie Booker came out of the trailer and said, "Nephew, what are you doing?"  He testified Booker tried to take the gun away from the man he called "Nephew" and told him to stop what he was doing, but the man pushed Booker away.  Boyington testified Willie Booker left the scene saying he was going to call the police, and that was the point in time when the men "started in on" Anthony Wright.  Boyington testified that Anthony Wright said he "was not putting up with this crap" and was going to leave.  Boyington testified the men said they didn't tell him he could leave yet, but Wright kept walking toward his car.  Boyington testified he heard a couple of gunshots, and as he was trying to get in his car to leave, he heard a couple more gunshots, and one of the shots shattered the rear window of his car. Boyington testified Anthony Wright backed his car out into the street, and the men walked toward Wright's car and shot two or three more times in the driver's door.  He testified that as he was leaving, he passed a policeman.  He testified the perpetrators left the scene just ahead of him and were gone when he was leaving the scene.  Boyington testified he later went to jail and contacted

law enforcement.  He testified he identified the shooter from a lineup.  Boyington testified that the man robbing him was Willie Booker's nephew.

On cross-examination, Boyington admitted he took a six-pack of beer to Willie Booker's trailer that night and drank the beers and smoked crack (Ex. B at 378–404).  Contrary to Herman Levins's testimony, Boyington testified that none of the men actually took his wallet; instead one of them threw it on the ground (*id.* at 397).  Also contrary to Levins's testimony, Boyington testified he never took money out of his pocket or handed money to the robber (*id.*).  Boyington admitted he did not know that Willie Booker called the kids in the neighborhood "Nephew" (*id.* at 379–80).  He testified that he identified Kelvin Brown as the shooter (*id.* at 402), and he did not see the gun change hands (*id.* at 379, 398, 402).  He testified that of all the three men, he got the best look at the man robbing him with the gun, because he was only fifteen feet from him (*id.* at 390).  Boyington testified there were three men present during the robbery and shooting (besides him and Anthony Wright): the man robbing him with the gun, the second man who retrieved his wallet from the top of his car, and the third man standing toward the back of the car on the other side of it, who did not have an active role (*id.* at 389–92).  Boyington then testified that the passenger side of Anthony Wright's car was closest to the shooter (*id.* at 401).  He testified that after Anthony Wright was shot, the three men ran toward their vehicle (a blue Marquis), and the two men doing the robbing and shooting jumped into the passenger and back seat, while the third man, who had been standing toward the back of the car, drove the blue Marquis (*id.* at 389–92).

Investigator Ray Robinson testified that Petitioner described his activities on the night in question as follows:

> [H]e advised us that between 10:00 [p.m.] and 1:30 [a.m.] he was at home.  At 1:45 he decided to go riding in his vehicle.  He ended up going to the bottom area, which is Fairfield and Michigan Road.  He arrived at the bottom area [where Wille Booker's trailer was located] about 2 o'clock.
> . . . .
> He said he didn't see anything going on over there other than he noticed a friend, Sonya Cunningham, stopped and tried the talk to her [sic], and she didn't have much to say to him, so he left and he decided to go to another female's house.  He didn't know where she lived, but he said she was somewhere over on 9th Avenue.  Once he got in that area, he couldn't find the house.  He left there and decided to go by RK's club, which is just south of Fairfield Drive on Davis Highway.
> . . . .

From RK's he went to the Player's club on Palafox, drove through the parking lot and then he left there and went out to the blocks, which is the intersection of Belmont and Devilliers.  Once he arrived on the blocks, he said that he ended up going behind the chicken stand and gambled there.  We asked him did he see anyone in that area.  He said he saw guys by the nickname of Fat and Pimp, and he also saw his cousin Keokie Simmons.  From there he said that he left at 6 o'clock a.m. and he went back to Angela Hopkins' house, which is next door to his house.

(Ex. B at 281–83).

Angela Hopkins testified that Petitioner, Kelvin Brown, and Herman Levins came to her apartment at 5:55 a.m. on August 10, 1996 (Ex. B at 296–99).  She testified they arrived in Petitioner's blue car, and Petitioner was driving.

Based upon the trial evidence, Petitioner's collateral counsel was not ineffective for omitting a claim of IATC based upon counsel's advising Petitioner not to testify and failing to call him as a witness.  The IATC claim was not sufficiently meritorious, primarily with regard to Strickland's prejudice requirement, such that collateral counsel's failure to present it was a decision that no competent counsel would make.  In assessing prejudice under Strickland, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently.  *See* Harrington, 131 S. Ct. at 792–93 (citations omitted).  Instead, Strickland asks whether it is "reasonably likely" the result would have been different.  *Id.* at 793 (citing Strickland, 466 U.S. at 696).  "This does not require a showing that counsel's actions "more likely than not altered the outcome," but the difference between Strickland's prejudice standard and a more-probable-than-not standard is slight and matters 'only in the rarest case.'"  *Id.* (quoting Strickland, 466 U.S. at 693, 697).  The likelihood of a different result must be "substantial," not just "conceivable."  *Id.* (citing Strickland, 466 U.S. at 693).

It would not have been unreasonable for Petitioner's collateral counsel to conclude that Petitioner's evidence of prejudice fell short of this standard.  Petitioner's trial counsel did an excellent job of pointing out critical inconsistencies in the testimony of Herman Levins and Kevin Boyington.  Counsel also elicited crucial testimony favorable to the defense, for example, testimony from Levins that Willie Booker referred to everyone in the neighborhood as "Nephew," including Levins, Petitioner, and Kelvin Brown.  Counsel also elicited testimony from Boyington that the

person who drove the blue Marquis away from the scene was not the shooter or either of the two men actively involved in the robbery.  Petitioner's trial counsel also elicited extremely damaging admissions from Herman Levins that he lied to police, lied in his sworn deposition, and lied to the grand jury, and that he had never been charged with obstruction, perjury, or providing false information in an official proceeding.  Counsel also presented evidence that the testimony of Levins and Booker was untrustworthy, because they both had self-serving motives for testifying for the State, namely, favorable treatment in their own criminal cases.  Petitioner's counsel additionally elicited admissions from Levins, Booker, and Boyington that they all drank a substantial amount of alcohol and smoked crack that evening, which called into question the accuracy and reliability of their testimony.

Additionally, the jury would have had two significant reasons for disbelieving Petitioner's testimony.  First, his credibility would have been subject to impeachment with the fact that he had two prior felony convictions.  Second, the version of events to which Petitioner would have testified (set forth, *supra*) would have been inconsistent, either directly or impliedly, with the account he provided to police, as described in Investigator Robinson's trial testimony.  As explained by Investigator Robinson, Petitioner told police that he went to "the bottom" (*i.e.*, that area where Willie Booker's trailer was located) at approximately 2:00 a.m., but did not see anything going on, so he left and drove to three other locations, ended up gambling at "the blocks," and from there went to Angela Hopkins's apartment shortly before 6:00 a.m.  Thus, Petitioner essentially told police he was in the area of the shooting (*i.e.*, "the bottom") three hours prior to when the shooting occurred and was nowhere near "the bottom" at the time of shooting, but instead he was at "the blocks," after having been several other places prior to arriving there.  However, according to Petitioner's proposed testimony, he would have admitted he was at "the bottom" when Boyington and Wright were there and when the shooting occurred.  Had Petitioner testified, the jury could have not only disbelieved his testimony (due to the aforementioned credibility issues and inconsistencies), but also concluded that the opposite of his testimony was true.  *See* Atkins v. Singletary, 965 F.2d 952, 961 n.7 (11th Cir. 1992) (a defendant who testifies runs the risk that a jury will both disbelieve his testimony and conclude that the opposite of his testimony is true).

Moreover, if Petitioner had testified, he would have relinquished the primacy and recency effect of the closing argument "sandwich" or, in other words, the benefits inherent in giving both first and last closing argument.[10]

A competent collateral lawyer could conclude, based upon an assessment of the record and Petitioner's proposed testimony, that there was no reasonable probability the jury would have acquitted Petitioner if he had testified.  Therefore, collateral counsel was not ineffective for failing to raise the IATC claim asserted in Ground Two.  In light of this conclusion, Petitioner failed to satisfy the requirements of <u>Martinez</u> and thus cannot establish cause for his failure to raise Ground Two in the state courts.  Accordingly, he is not entitled to a merits review of Ground Two in this federal habeas proceeding.

C.    <u>Ground Three:  "Counsel ineffective for failure to object to erroneously flawed jury instruction and verdict form under Blockburger and object to reading and verdict form as a construction [sic] amendment to original indictment."</u>

Petitioner alleges defense counsel was ineffective for failing to object to the inclusion of jury instruction on the lesser offense of second-degree (depraved mind) murder, on the ground that giving the instruction constituted constructive amendment of the indictment, in violation of <u>United States v. Blockburger</u>, 284 U.S. 299 (1932) (doc. 19 at 19–24; doc. 26 at 10–15).  He alleges it was well established at the time of his trial that second-degree (depraved mind) murder was not a necessarily lesser included offense of first degree felony murder under Florida law; therefore, defense counsel should have objected to the court's giving the jury instruction on second-degree (depraved mind) murder and including it on the verdict form (*id.*).  Petitioner alleges he told his trial counsel he wished to object to the instruction on second-degree  (depraved mind) murder, but counsel failed to object to the instruction or verdict form (*id.*).  Petitioner contends counsel's failure to object deprived him of the opportunity for the jury to exercise its pardon power or convict him of manslaughter as the "next one-step necessarily removed lesser-included offense" (doc. 19 at 23–24).

---

[10] When Petitioner was tried in 1998, the defense was permitted to give both the opening and rebuttal closing arguments if it did not present a case-in-chief.  Since Petitioner's trial, the Florida Legislature enacted Florida Statutes § 918.19 (2007), which provides that the State shall give opening and rebuttal closing arguments.  Correspondingly, the Florida Supreme Court amended Florida Rule of Criminal Procedure 3.250 and adopted Florida Rule of Criminal Procedure 3.381, confirming that the State is entitled to opening and rebuttal closing arguments even if the defense presents no case-in-chief.  *See* In re Amendments to Fla. Rules of Crim. Pro.-Final Arguments, 957 So. 2d 1164, 1166–67 (Fla. 2007).

As with Ground Two, Petitioner admits he did not present this claim to the state court (*see* doc. 19 at 29), and he relies upon Martinez to show cause for his procedural default (doc. 26 at 10–15).

Respondent contends Petitioner has not presented this claim to the state court and thus procedurally defaulted the issue (doc. 22 at 35–39).  Respondent argues Petitioner failed to satisfy Martinez, because he has not established a substantial underlying IATC claim (*id.*).

The undersigned agrees with Respondent that Petitioner has not established that his underlying IATC claim is a substantial one.  The trial court instructed the jury that they could convict Petitioner of first degree felony murder, as charged, or of the following six lesser included offenses, all of which were also included on the verdict form:  second degree murder, with a firearm and without a firearm; second degree felony murder, with a firearm and without a firearm; and manslaughter, with a firearm and without a firearm (Ex. A at 59–60; Ex. B at 509–15).  Petitioner claims that his trial counsel was ineffective for failing to object to the jury instruction on second-degree (depraved mind) murder, on the ground that it was erroneous because this offense was not a necessarily included offense of first degree felony murder.[11]  First, in Linehan v. State, the Supreme Court of Florida held that that "second-degree (depraved mind) murder" was a necessarily lesser included offense of first-degree felony murder.  476 So. 2d 1262, 1263, 1265 (Fla. 1985).  The Florida Supreme Court also suggested that the Florida Standard Jury Instructions schedule of lesser included offenses be amended to include second-degree murder as a necessarily lesser included offense of first-degree felony murder.[12]  *Id.*  At the time of Petitioner's trial in February of 1998,

---

[11] Petitioner's instant claim evidently concerns the jury instruction on second degree murder, and not second degree felony murder, because—as articulated by the trial court—the second degree murder instruction included as an element of the offense that "there was an unlawful killing of Anthony Jerome Wright by an act imminently dangerous to another and demonstrating a depraved mind without regard for human life" (Ex. B at 12) (emphasis added), whereas the instruction for second degree felony murder did not include the depraved mind element (*see id.* at 513–14).

[12] Florida recognizes two separate categories of lesser included offenses: "Category 1," or necessarily lesser included offenses; and "Category 2," or permissive lesser included offenses.  In re the Use by the Trial Courts of the Standard Jury Instructions in Criminal Cases, 431 So. 2d 594, 596 (Fla. 1981), *modified*, 431 So. 2d 599 (Fla. 1981).  "Necessarily lesser included offenses are those offenses in which the statutory elements of the lesser included offense are always subsumed within those of the charged offense."  Sanders v. State, 944 So. 2d 203, 206 (Fla. 2006). Category 2 or permissive lesser included offenses are those offenses in which the elements are not necessarily subsumed into the greater offense.  Because a Category 2 or "permissive" lesser included offense has statutory elements that are facially distinct from the greater offense, it can be subsumed into the greater offense only when the charging document and the evidence support the additional facts needed to sustain the charge.  *See* State v. Weller, 590 So. 2d 923, 925 & n.2 (Fla. 1991).

Linehan was the prevailing law.  It is true that in 2010, twelve years *after* Petitioner's trial, the state supreme court receded from Linehan and held that second-degree murder is not a necessarily lesser included offense of first-degree felony murder, *see* Coicou v. State, 39 So. 3d 237, 243 (Fla. 2010). However, Strickland does not require counsel to make arguments based on predictions of how the law may develop.  *See, e.g.*, Jackson v. Herring, 42 F.3d 1350, 1359 (11th Cir. 1995) ("To be effective within the bounds set by Strickland, an attorney need not anticipate changes in the law."); Spaziano v. Singletary, 36 F.3d 1028, 1039 (11th Cir. 1994) ("We have held many times that reasonably effective representation cannot and does not include a requirement to make arguments based on predictions of how the law may develop."); Funchess v. Wainwright, 772 F.2d 683, 691 (11th Cir. 1985) ("The failure of counsel to anticipate that an otherwise valid jury instruction would later be deemed improper by the state judiciary does not constitute ineffective assistance of counsel.").

Second, Petitioner was not prejudiced by his trial counsel's failure to object to either of the second degree murder jury instructions or the inclusion of those offenses on the verdict form, as no logical basis exists to conclude that their omission would have led a rational jury to reach a different verdict.  The jury was presented with six alternative lesser offenses—including manslaughter, the offense Petitioner contends he would have been convicted of had the jury not been instructed on second degree murder—but nevertheless found Petitioner guilty of the highest, first degree felony murder offense.  Thus, "presuming a rational jury as this court must do," the omission of second degree murder from the jury instructions and verdict form "would not have changed the outcome of the trial."  *See* Nichols v. Davenport, No. 2:10-CV-2653-SLB-JEO, 2014 WL 1042847, at *13 (N.D. Ala. Mar. 17, 2014) (citing Johnson v. Alabama, 256 F.3d 1156, 1183 (11th Cir. 2001)). Therefore, it was reasonable for Petitioner's collateral counsel to omit this underlying IATC claim from Petitioner's Rule 3.850 motion.

Petitioner has not established ineffective assistance of post-conviction counsel as cause for his failure to exhaust Ground Three in the state courts.  Therefore, he is not entitled to a federal merits review of his IATC claim asserted in Ground Three.

D.   Ground Four:  "Counsel was ineffective for failure to investigate and request Richardson hearing and Brady violation [sic] in the State's failure to disclose to defense that

<u>a copy of its chief witness's grand jury testimony had been transcribed by court or before trial [sic]."</u>

Petitioner alleges Kevin Boyington testified at grand jury proceedings held on November 19, 1996, which resulted in issuance of the indictment charging him, Kelvin Brown, and Herman Levins with first degree murder and armed robbery (doc. 19 at 30–35; doc. 26 at 15–23).  He alleges on November 27, 1996, the trial court granted the State's motion for transcription of Kevin Boyington's grand jury testimony (*id.*).  Petitioner alleges that prior to his own trial, co-defendant Brown's attorney (Mr. Rollo) filed a motion to unseal and transcribe the grand jury proceedings (*id.*).  He alleges the court held a hearing on the motion on April 16, 1997, and Petitioner's trial counsel attended that hearing (*id.*).  Petitioner alleges the trial court denied Mr. Rollo's motion, and Petitioner's counsel "did not object" (*id.*).  Petitioner contends defense counsel should have filed a pre-trial motion alleging a <u>Brady</u>/discovery violation based upon the State's failure to disclose Boyington's grand jury testimony, which would have required the trial court to hold a <u>Richardson</u> hearing[13] (*id.*).  He alleges the trial court would then have reviewed Boyington's grand jury testimony *in camera* and discovered that Boyington's grand jury testimony was inconsistent with his statement to investigators and his deposition testimony (*id.*).  Petitioner contends if counsel had filed the motion, the court would have required the State to produce the transcript, as evidenced by the fact that the same trial court granted Mr. Rollo's request for the transcript <u>after</u> Petitioner's trial and he was able to use it at co-defendant Kelvin Brown's trial, which resulted in Brown's conviction of only manslaughter and an acquittal of the armed robbery charge (*id.*).  Petitioner alleges defense counsel could have impeached Boyington's trial testimony—that the robber was Willie Booker's nephew but the shooter was Kelvin Brown—with Boyington's grand jury testimony that the robber and the shooter were the same man, and this would have changed the outcome of his trial (*id.*)

Respondent contends to the extent Petitioner is claiming a violation of state discovery rules, the claim is unexhausted and procedurally defaulted, because it was never presented to the state

---

[13] In <u>Richardson v. State</u>, 246 So. 2d 771, 775 (Fla. 1971), the court held that when it is brought to the attention of the trial court that the State has failed to comply with a discovery rule, the court must make an adequate inquiry into all of the surrounding circumstances.  Where a discovery violation occurrs, the trial court is required to conduct a full inquiry as to whether the violation:  (1) was willful or inadvertent, (2) was substantial or trivial, and (3) had a prejudicial effect on the aggrieved parties' trial preparation.  *See* <u>Delhall v. State</u>, 95 So. 3d 134, 160 (Fla. 2012); <u>Richardson</u>, 246 So. 2d at 775.

courts (doc. 22 at 40).  Further, there is no constitutional right to access to grand jury proceedings or transcripts; therefore, Petitioner is not entitled to relief on a claim of a discovery violation (*id.* at 41–42).  Respondent contends to the extent Petitioner is generally claiming he was entitled to Boyington's grand jury testimony, and the State's failure to disclose it constituted a <u>Brady</u> violation, the claim was litigated both in state and federal court (*id.* at 42–43).  Respondent contends the federal habeas court reviewed the claim de novo and denied it on the merits; therefore, the law-of-the-case doctrine forecloses Petitioner from raising it again here (*id.*).

Petitioner concedes that in his first Rule 3.850 motion, he presented a claim of ineffective assistance of counsel based upon trial counsel's failure to renew his pre-trial request for release of Boyington's grand jury testimony, and the state court determined that the claim was procedurally barred (*see* doc. 19 at 32 n.6; doc. 26 at 15–16).  Petitioner also concedes he presented that claim in his first federal habeas petition, and this federal court reviewed the claim de novo and denied relief (*id.*).  He contends the instant claim is different, because he is contending trial counsel should have  filed a pre-trial motion alleging a <u>Brady</u> violation (doc. 26 at 16).  He also appears to assert a <u>Brady</u>/prosecutorial misconduct claim independent of his IATC claim (*id.* at 23).  Petitioner contends none of these issues was raised in his first Rule 3.850 motion or his first federal habeas petition, allegedly due to ineffective assistance of post-conviction counsel (*id.* at 16–23).

   1. <u>Brady claim</u>

Petitioner's <u>Brady</u> claim is not foreclosed by the law-of-the-case doctrine.  The federal court construed Claim Two of Petitioner's first federal habeas petition as claiming that the trial court violated his rights by denying him a new trial based on newly discovered evidence (*i.e.*, Boyington's grand jury testimony), and the federal court expressly stated that Petitioner was <u>not</u> claiming a <u>Brady</u> violation or prosecutorial misconduct as he did on direct appeal of his conviction (*see* <u>Carson v. Moore</u>, Case No. 3:01cv147/LAC/MD, Doc. 12, Report and Recommendation pp. 10–12).  The federal court then denied Petitioner's claim of newly discovered evidence (*see id.*).  Petitioner attempted to amend his federal habeas petition to add a <u>Brady</u>/prosecutorial misconduct claim (*see id.*, Doc. 16, Motion for Leave to Amend), but the district court denied the motion (*see id.*, Doc. 27, Order).  Therefore, Petitioner's <u>Brady</u> claim is not foreclosed by the law-of-the-case doctrine.

Further, Respondent concedes that Petitioner's <u>Brady</u> claim was litigated in the state courts (*see* doc. 22 at 40).  Therefore, the court will determine whether the First DCA's adjudication of the <u>Brady</u> claim is entitled to deference and, if not, whether de novo review of the claim shows that Petitioner is entitled to relief.

           a.        Clearly Established Federal Law

In <u>Brady v. Maryland</u>, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  373 U.S. at 87.  In <u>Strickler v. Greene</u>, 527 U.S. 263, 281–82, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999), the Supreme Court set out the three components or essential elements of a <u>Brady</u> prosecutorial misconduct claim:  "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."  527 U.S. at 281–82.  With regard to the prejudice component, "favorable evidence is material, and constitutional error results from its suppression by the government, if there is a 'reasonable probability' that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  <u>Kyles v. Whitley</u>, 514 U.S. 419, 434, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995).  The prejudice standards under <u>Brady</u> and <u>Strickland</u> are basically the same. *See* <u>Tanzi v. Sec'y, Fla. Dep't of Corr.</u>, — F.3d —, 2014 WL 6462903, at *15 (11th Cir. Nov. 19, 2014).

           b.        Federal Review of State Court Decision

Kevin Boyington's grand jury testimony is part of the state court record (Ex. I at 13–48). He testified to the grand jury that the man who discharged the gun was the man who told him to put all his money on the car (*id.* at 25).  Boyington testified that a second man was on the other side of the car telling him (Boyington) the same thing (*id.*).  Boyington testified he put his wallet on top of his car, and the second man reached up and got it (*id.*).  Boyington told the grand jury that the man with the gun had a confrontation with Willie Booker (*id.*).  He testified Booker was trying to get the gun away from the man, but the man with the gun shoved Booker away, and Booker went to call law enforcement (*id.* at 25–26).  Boyington told the grand jury that about that time, Anthony Wright

walked in front of the car and told the men to leave Boyington alone (*id.* at 26).  Boyington testified the man with the gun took the beer away from Wright (*id.*).  Boyington testified that the third man stayed behind the car the entire time, not saying anything (*id.* at 27).  Boyington testified that Wright proceeded to his car, and the man with the gun and the second man told Wright to stop because they did not tell him he could go yet (*id.* at 29).  Boyington testified Wright kept walking to his car, and the man with the gun started following him (*id.*).  Boyington testified that the man with the gun was the only shooter, and the man first shot at Boyington's car and then shot Anthony Wright's car three times (*id.* at 31–32).  Boyington testified that the man with the gun was standing on the driver's side of Wright's car (*id.* at 32).  The prosecutor interjected and told Boyington that as a factual matter, Anthony Wright was shot from his right side (the bullet entered his right arm and then lodged in his right chest).  Boyington responded that he did not know how the bullet could have entered Wright on his right side unless someone from across the street shot him from that side (*id.* at 32–33).  Boyington told the grand jury he saw only one firearm, but more than one gun could have been involved if Wright was shot from the other side (*id.*).  Boyington told the grand jury that the man who was related to Willie Booker was the person who had the gun, and that was the person who robbed him, shot out his car window, and shot at Anthony Wright (*id.* at 34, 46).  Boyington testified that at the time the man shot at Wright, the second man was standing immediately beside the shooter, and the third man was on the other side of the street near a blue car (*id.* at 34–37).  He testified he did not see the third man with a gun that night, but it was possible he could have had one (*id.* at 38).  Boyington testified he was shown a lineup and picked out the person who had the gun on him the whole time (*id.* at 35).  He testified he did not know the name of the man he identified from the lineup, but he identified the man in the lineup by appearance as being the man who had the gun the night Anthony Wright was killed (*id.* at 44–45).

On February 16, 1998, Petitioner's trial counsel filed a motion for new trial asserting that after Petitioner's trial, he obtained evidence that Boyington's trial testimony contradicted his testimony before the grand jury (Ex. A at 62–69).  Counsel asserted that prior to trial, he had filed a notice to participate in discovery (*id.*).  Counsel stated he also adopted co-defendant Brown's motion to unseal the grand jury proceedings, but the court denied the motion at a hearing on April 14, 1997, rendering the grand jury testimony otherwise unavailable to the defense (*id.*).  Counsel

alleged that after Petitioner's trial, co-defendant Brown's counsel filed a motion to obtain a transcript of Boyington's grand jury testimony based upon inconsistencies in Boyington's trial testimony and his deposition and police statement (*id.*).  Petitioner's counsel alleged the trial court granted Brown's motion, and on February 13, 1998, Petitioner's counsel received from Brown's counsel a transcript of Boyington's grand jury testimony (*id.*).  Counsel argued the State's failure to disclose  Boyington's grand jury testimony constituted a violation of Petitioner's right to obtain favorable evidence, in violation of <u>Brady</u> and the Florida Rules of Criminal Procedure (*id.*).  Counsel attached to his motion for new trial a court order dated September 4, 1997, directing that transcriptions of Petitioner's and Herman Levins's grand jury testimony be furnished to counsel for all of the co-defendants (the testimony was previously transcribed for the benefit of the State) (*id.* at 80).  Defense counsel also attached a court order dated November 27, 1996, directing that Boyington's grand jury testimony be transcribed and provided to the prosecutor (*id.*).

The trial court held a hearing on defense counsel's motion for new trial on March 11, 1998 (Ex. A at 83–110).  Defense counsel argued that Boyington's grand jury testimony was <u>Brady</u> material which had not been provided to the defense prior to trial (*id.* at 84–85).  Counsel asserted that Boyington testified at Petitioner's trial that the man who robbed him with the gun was Willie Booker's nephew, but the man who shot Anthony Wright was Kelvin Brown; whereas Boyington testified to the grand jury that the man who robbed him was the same man who shot Wright, and he identified that man in a lineup (*id.* at 86–89, 91–92).  Defense counsel admitted that in Boyington's recorded statement to law enforcement, which the defense was provided prior to trial, Boyington stated there was one person who did the robbing and shooting, and he never saw the gun change hands, but Boyington did not mention the name of the person he identified in the lineup (*id.* at 89, 98).  Defense counsel told the court that in Boyington's deposition, Boyington stated (1) there was one person who did the robbing and shooting; (2) he never saw the gun change hands; (3) he was uncertain as to the role played by the person he identified from the photo lineup; and (4) the person he identified from the photo lineup did the shooting (which appears to conflict with counsel's representation that Boyington was uncertain as to the role played by the person he identified from the photo lineup) (*id.* at 88, 98–99, 102).  Defense counsel further argued that Boyington's trial testimony that the passenger side of Anthony Wright's car was closest to the shooter contradicted

his grand jury testimony that the shooter was on the driver's side of Wright's car (*id.* at 96). However, counsel admitted that Boyington's deposition testimony was consistent with his grand jury testimony in this regard (*id.* at 96–97).

The prosecutor argued that "from day one," the defense had access to Boyington's statement to investigators that the person he picked out of the lineup was the shooter and the person who had the gun the whole time, and the defense had access to evidence that the name of the person Boyington picked out of the lineup was Kelvin Brown (Ex. A at 101). The trial court denied the motion for new trial on the ground that the jury was well aware that Willie Booker, Herman Levins, and Kevin Boyington gave contradictory testimony, and the jury made credibility determinations and returned their verdict (*id.* at 104–05).

On direct appeal, Petitioner argued as Issue III that the trial court erred in failing to grant a new trial when the State deliberately suppressed Boyington's grand jury testimony, which conflicted with his trial testimony (Ex. D at 25–29, Ex. F at 8–9). Petitioner argued Boyington told the grand jury that the same person was both the robber and the shooter, and that he identified Kelvin Brown as that person; however, at trial he testified that the robber was a different person from the shooter (*id.*). Petitioner argued that when the defense moved to obtain transcripts of the grand jury testimony, the prosecutor failed to disclose to the court that Boyington would give trial testimony contrary to his grand jury testimony (*id.*). Petitioner argued if the State had made this disclosure, the court would have granted the motion to provide the defense with the grand jury testimony, as evidenced by the fact that the court granted the same motion after Petitioner's trial, thus permitting co-defendant Kelvin Brown access to Boyington's grand jury prior to his trial (*id.*). Petitioner argued he was prejudiced by the State's failure to disclose the conflicting grand jury testimony, because the State's evidence in his case was weak and based upon conflicting testimony, and if he could have impeached Boyington with his grand jury testimony that the robber and the shooter were the same person, and that he (Boyington) identified that person as Kelvin Brown, there is a reasonable probability it would have created reasonable doubt in the minds of the jurors (*id.*). Petitioner argued that without Boyington's grand jury testimony, he had no opportunity to impeach Boyington's trial testimony that Willie Booker's nephew was the robber  (*id.*). The First DCA affirmed Petitioner's convictions without discussion of this particular issue (Ex. G).

A federal habeas court may overturn a state court's application of federal law only if it is so erroneous that "there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents." Harrington, 131 S. Ct. at 786 ("Under § 2254(d), a habeas court must determine what arguments or theories supported or, . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court."). Applying this standard, the undersigned concludes that the First DCA's adjudication of Petitioner's Brady claim was reasonable.  With regard to the "suppression" component of the Brady standard, the question comes down to whether the State had a duty to disclose that Boyington testified unequivocally to the grand jury that the man who robbed him and shot at Anthony Wright was related to Willie Booker, and he (Boyington) identified that man in the lineup.  Prior to Petitioner's trial (and prior to the hearing on counsel's request for release of transcripts of the grand jury proceedings), Boyington's statement to law enforcement was available to the defense.  Defense counsel admitted that in that statement, Boyington stated that one person did the robbing and shooting, and he never saw the gun change hands (see Ex. A at 89).  The defense also had Boyington's testimony from his deposition (which occurred after the hearing on counsel's request for the grand jury testimony) in which he stated (1) there was one person who did the robbing and shooting; (2) he never saw the gun change hands; (3) he was uncertain as to the role played by the person he identified from the photo lineup; and, the seemingly contradictory statement that (4) the person he identified from the photo lineup did the shooting.  Therefore, evidence that Boyington unequivocally stated that the same man who robbed him also shot at Anthony Wright was available to the defense prior to Petitioner's trial.  Further, it is undisputed that the identity of the person Boyington picked out of the photo lineup, that is, Kelvin Brown, was available to the defense prior to trial.  It is also evident from the trial transcript that defense counsel knew prior to trial that Boyington would testify that Willie Booker referred to the man with the gun as "Nephew," because prior to Boyington's trial testimony, defense counsel adduced evidence from Herman Levins that Booker called everyone in the neighborhood "Nephew."  Petitioner has failed to demonstrate that the state court's application of the "suppression" component of the Brady standard was "so

erroneous that there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents."

The same is true of the "materiality" component of the <u>Brady</u> standard.  As previously discussed, the evidence is "material" if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.  Boyington testified at trial that there were three men present during the robbery and shooting (besides him and Anthony Wright): the man robbing him with the gun, the second man who retrieved his wallet from the top of his car, and the third man standing toward the back of the car on the other side of it, who did not have an active role.  He testified that of all the three men, he got the best look at the man robbing him with the gun, because he was only fifteen feet from him.  He testified that the man with the gun was the person who Willie Booker called "Nephew."  He testified he did not see the gun change hands.  He testified that he identified the shooter in the lineup, and that person was Kelvin Brown.  Boyington's trial testimony may not have been as unequivocal as his grand jury testimony as to whether the same man who robbed him also shot at Anthony Wright, but the defense certainly could have asked Boyington whether he was certain that the same man was the robber and shooter.  If Boyington answered that he was not certain, defense counsel could have impeached him with his statement to law enforcement or his deposition testimony, in which Boyington's stated that one person did the robbing and shooting, and he never saw the gun change hands.  Petitioner failed to show a reasonable probability that, had Boyington's grand jury testimony been disclosed to the defense, the result of the trial would have been different; therefore, he failed to satisfy the "materiality" element of a <u>Brady</u> violation.

In sum, Petitioner failed to demonstrate that the state court's adjudication of his <u>Brady</u> claim was contrary to or an unreasonable application of clearly established federal law.  Therefore, he is not entitled to federal habeas relief on this claim.

      2.    <u>IATC claim:  trial counsel was ineffective for failing to investigate and request a pre-trial hearing on the State's Brady violation</u>

Petitioner contends trial counsel should have investigated and requested a hearing on the State's alleged <u>Brady</u> violation, specifically, the State's failure to disclose that the transcript of Boyington's grand jury testimony had been released to the prosecution but not turned over to the defense (doc. 26 at 16).  Petitioner contends this is separate from the claim he raised in his first Rule

3.850 motion and his first federal habeas petition (*id.* at 15–16), because that claim concerned trial counsel's failure to renew the pre-trial request for release of grand jury testimony; whereas, the instant claim concerns counsel's failure to file a pre-trial motion alleging a <u>Brady</u> violation based upon the State's having possession of the transcript of Boyington's grand jury testimony yet failing to turn it over to the defense (*id.*). Petitioner contends his failure to raise this claim in his first Rule 3.850 motion was caused by ineffective assistance of collateral counsel (*id.* at 16–22).

To the extent this is the same IATC claim presented in Petitioner's first Rule 3.850 motion and presented as Claim One in Petitioner's federal habeas petition, this federal court conducted a de novo review of the claim and denied relief (*see* <u>Carson v. Moore</u>, Case No. 3:01cv147/LAC/MD, Doc. 12, Report and Recommendation pp. 5–10). The undersigned adopts and incorporates the court's reasoning and result of its prior adjudication of this claim.

To the extent this claim is different from the IATC claim that Petitioner raised in his first Rule 3.850 motion and his first federal habeas petition in that Petitioner now alleges trial counsel should have pursued a different legal vehicle for obtaining Boyington's grand jury testimony (*i.e.*, via a motion alleging a <u>Brady</u> violation instead of a renewed motion for release of the grand jury testimony), the claim is unexhausted (as Petitioner concedes) and procedurally defaulted. Petitioner contends the procedural default was caused by ineffective assistance of collateral counsel. However, for the reasons discussed *supra*, there is no reasonable probability that, had Boyington's grand jury testimony been disclosed to the defense, the result of the trial would have been different; therefore, Petitioner's collateral counsel was not ineffective for failing to raise an IATC claim based upon trial counsel's failure to file a pre-trial motion alleging a <u>Brady</u> violation. Because Petitioner failed to show cause for his failure to exhaust his IATC claim in the state courts, he is not entitled to a federal merits review of the IATC claim asserted in Ground Four.

    E.    <u>Ground Five: "Counsel ineffective [sic] for failure to consult and call as a witness an expert in the fallibility of eyewitness testimony."</u>

Petitioner contends his trial counsel should have consulted with and presented testimony from an expert in the field of fallibility of eyewitness testimony to expose the fallibility of the trial testimony of Herman Levins, Willie Booker, and Kevin Boyington (doc. 19 at 38–43; doc. 26 at 23–26). He alleges counsel knew or should have known that the effect of "complicating factors" on a witness's memory was not within the common experience of juries (*id.*). He alleges Levins,

Booker, and Boyington gave inconsistent pre-trial accounts of the robbery and shooting (*id.*).  He alleges an expert would have testified to the following:

> 1) Weapons Focus Effect which details the effect of high stress and the presence of weapons along with the high consumption of alcohol with drugs impaired Boyington, Booker and Levins's perception/memory of the incident.
>
> 2) Boyington's identification was cross-racial, and according to experts, is one of the most unreliable of liable identifications.
>
> 3) Unconscious transference of events led to incorrect identification by the three key witnesses.  Unconscious transference occurs when a witness confuses a person seen in one situation with someone seen in a different situation.
>
> 4) Boyington, Booker and Levins adhered to faulty memory, which led to them giving several different accounts, thus mitigating the value of the in-court identification and testimonies at trial.
>
> 5) In addition to the listed factors, which affected the witnesses' ability to observe, remember and identify [Petitioner] at the time of the incident, an expert would have provided additional testimony relevant to the jurors' assessment of reliability.
>
> 6) Also, empirical research as a major cause of witness misidentification indicates that new information can do more than simply supplement a memory:  It can apparently alter or transform the memory.
>
> 7) Feed Back Factor which is a psychological phenomenon that demonstrates that witnesses who discuss the case with each other may unconsciously reinforce mistaken identification and their certainty.

(doc. 19 at 40).  Petitioner alleges there is a reasonable probability that if counsel had presented testimony of a psychological expert regarding the fallibility of eyewitness testimony, the result of his trial would have been different, as it would have cast doubt on the eyewitnesses' trial testimony (*id.* at 42).  He contends his collateral counsel was ineffective for failing to present this claim in his Rule 3.850 motion; therefore, he is entitled to federal review under <u>Martinez</u> (doc. 26 at 23–26).

Respondent contends this claim is unexhausted and procedurally defaulted (doc. 22 at 43–45).  Respondent further argues Petitioner has not shown cause for the default under <u>Martinez</u>, because he failed to show that his collateral counsel was ineffective or that his underlying IATC claim was substantial (*id.*).

Counsel's decision whether to call a particular witness is a matter of trial strategy entitled to great deference.  Chandler, 218 F.3d at 1314 n.14 (citing Waters v. Thomas, 46 F.3d 1506, 1512, 1518–19 (11th Cir. 1995) (en banc)).  If the record is not complete regarding counsel's actions, then the courts should presume "that what the particular defense lawyer did at trial—for example, what witnesses he presented or did not present—were acts that some reasonable lawyer might do."  Id. at 1314–15 n.15.  "The mere fact that other witnesses might have been available or that other testimony might have been elicited from those who testified is not a sufficient ground to prove ineffectiveness of counsel."  Waters, 46 F.3d at 1514.  "Complaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified are largely speculative."  Buckelew v. United States, 575 F.2d 515, 521 (5th Cir. 1978).

Petitioner has not shown that his collateral counsel was ineffective for failing to raise this IATC issue in the Rule 3.850 proceeding.  Initially, Petitioner did not submit an affidavit from an expert, or other reliable evidence, showing that an expert was available to testify and would have testified consistently with the proposed testimony alleged by Petitioner.  Thus, Petitioner's allegations as to the content of an expert's testimony are purely speculative and insufficient to show that the underlying IATC claim was a substantial one, or that collateral counsel was ineffective for failing to raise the IATC claim.

Further, Petitioner has not shown that the trial court would have admitted the expert testimony.  Under Florida law, it is clear that a trial court has wide discretion concerning the admissibility of evidence and the range of subjects about which an expert can testify.  See Frances v. State, 970 So. 2d 806, 814 (Fla. 2007); Johnson v. State, 393 So. 2d 1069, 1072 (Fla. 1980).  The Florida Supreme Court has held that expert testimony should be excluded when the facts testified to are of such nature as not to require any special knowledge or experience in order for the jury to form conclusions from the facts.  See Johnson, 393 So. 2d at 1072 (citations omitted).  In so ruling, the court concluded that a jury is fully capable of assessing a witness's ability to perceive and remember, given the assistance of cross-examination and cautionary instructions, without the aid of expert testimony.  See Johnson v. State, 438 So. 2d 774, 777 (Fla. 1983).  Under these circumstances, even if counsel had retained an expert, Petitioner has not shown that the trial court

would have permitted the expert's testimony, because there was nothing in the record to suggest that the facts to which Levins, Booker, and Boyington testified at trial were so complex that it would have required testimony from an expert to enable the jury to render a verdict.  *See* Lewis v. State, 572 So. 2d 908, 911 (Fla. 1990) (trial court did not abuse its discretion in excluding psychiatrist's opinion regarding the eyewitness identification process, the effects of drugs on memory, and the unwarranted reliance of jurors on eyewitness testimony, where psychiatrist admitted he could not testify regarding the reliability of any specific witness, but could only offer general comments about how a witness arrives at his conclusions).  Moreover, the unreliability and untrustworthiness of Levins's, Booker's, and Boyington's testimony was fully brought to the jury's attention through cross-examination of the State's witnesses.

Petitioner has not shown that collateral counsel's failure to present this issue was a decision that no competent counsel would have made, nor has he shown a reasonable probability that the result of the collateral proceeding would have been different if collateral counsel had presented this issue.  Moreover, Petitioner has not shown that the underlying IATC claim was a substantial one. *See* Jones v. Smith, 772 F.2d 668, 674 (11 Cir. 1985) (trial counsel was not ineffective for failing to present expert to testify as to unreliability of eyewitness testimony where likelihood of misidentification was fully explored on cross-examination); *see also, e.g.*, McLean v. State, 147 So. 3d 504, 511 (Fla. 2014) (applying Strickland and holding that defendant failed to establish prejudice from counsel's failure to call an expert in eyewitness identification where defense counsel presented evidence, through cross-examination, and argument that witness's identification was unreliable); Rimmer v. State, 59 So. 3d 763, 777 (Fla. 2010) (applying Strickland and holding that defendant was not prejudiced, as element of ineffective assistance of counsel, by counsel's allegedly deficient performance in failing to present an eyewitness identification expert at guilt phase of capital murder trial, where counsel conducted an effective cross-examination of the eyewitnesses and consistently attacked the eyewitness identifications and the process of making those identifications); Rose v. State, 617 So. 2d 291, 297 (Fla. 1993) (applying Strickland and holding that defense counsel was not ineffective for failing to obtain expert in eyewitness identification when, instead, he pointed out inconsistencies between the eyewitnesses' testimony as well as differences in the trial testimony of

each witness and his or her earlier statements).  Therefore, Petitioner has not shown he is entitled to federal habeas review of Ground Five.

V.     CERTIFICATE OF APPEALABILITY

As amended effective December 1, 2009, § 2254 Rule 11(a) provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)."  A timely notice of appeal must still be filed, even if the court issues a certificate of appealability.  Rule 11(b), Rules Governing Section 2254 Cases.

The undersigned finds no substantial showing of the denial of a constitutional right.  28 U.S.C. § 2253(c)(2); <u>Slack v. McDaniel</u>, 529 U.S. 473, 483–84, 120 S. Ct. 1595, 1603–04, 146 L. Ed. 2d 542 (2000) (explaining how to satisfy this showing) (citation omitted).  Therefore, the undersigned recommends that the district court deny a certificate of appealability in its final order.

The second sentence of new Rule 11(a) provides:  "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue."  Thus, if there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is respectfully **RECOMMENDED**:

1.     That the second amended petition for writ of habeas corpus (doc. 19) be **DENIED**.

2.     That a certificate of appealability be **DENIED**.

At Pensacola, Florida, this <u>31</u>st day of December 2014.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M.  TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

       Objections to these proposed findings and recommendations may be filed within fourteen (14) days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of objections shall be served upon the magistrate judge and all other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; <u>United States v. Roberts</u>, 858 F.2d 698, 701 (11th Cir. 1988).